UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

------------------------------X

UNITED STATES OF AMERICA,

    - against -                                          **MEMORANDUM & ORDER**

RAY VASQUEZ,                                              10-CR-1028 (KAM)

        Defendant.

------------------------------X

MATSUMOTO, UNITED STATES DISTRICT JUDGE:

       Defendant Ray Vasquez ("defendant") is charged with being a felon in possession of a firearm in violation of 18 U.S.C. §§ 922(g)(1), 924(a)(2), 3551 *et. seq.* (ECF No. 6, Indictment ¶ 1.)  Specifically, the defendant is charged with knowingly and intentionally possessing a .22 caliber Erma pistol (the "handgun") and ammunition on or about November 24, 2010 after, on a separate and earlier occasion, he had been convicted of a felony. (*See id.*)  Presently before the court is a motion by defendant to suppress the handgun as the fruit of an illegal search and seizure.  For the reasons set forth below, the motion is denied.

**BACKGROUND**

       According to the Complaint and Affidavit in Support of Arrest Warrant, on November 24, 2010, at approximately 4:00 PM, New York City Police Department ("NYPD") Officer Lawrence Perrotta and his partner, later identified as Officer Sean Finnegan, were on a routine Street Narcotics Enforcement Unit

("SNEU") operation in the vicinity of a building located at 578 Williams Avenue in Brooklyn, New York.[1]  (ECF No. 1, Complaint and Affidavit in Support of Arrest Warrant ("Compl.") ¶ 2.)  As Officer Perrotta and his partner approached 578 Williams Avenue, Officer Perrotta observed defendant holding a silver handgun in his right hand and thus drew his firearm and ordered defendant not to move.  (*Id.*)  Thereafter, defendant dropped his handgun to the ground and was placed under arrest.  (*Id.*)  After he was arrested, defendant stated that he was "on parole."  (*Id.*)  Subsequently, Officer Perrotta recovered the silver handgun and determined that it was a .22 caliber semi-automatic Erma pistol and was fully loaded.  (*Id.* ¶ 3.)  It is not in dispute that defendant previously was convicted of at least one felony.  (*See id.* ¶ 4.)

On July 13, 2011, defendant moved to suppress the handgun as the fruit of an illegal search and seizure in violation of the Fourth Amendment of the United States Constitution. (*See* ECF No. 16, Notice of Motion to Suppress ("Mot. to Suppress").)  In support of his motion, defendant submitted a declaration under penalty of perjury stating that,

---

[1]  During his testimony at the suppression hearing described below, Officer Perrotta does not recall describing 578 Williams Avenue as an "abandoned building" to NYPD Detective Raymond Martinez, the affiant of the Complaint and Affidavit in Support of Arrest Warrant, in which 578 Williams Avenue was described as an abandoned building.  (*See* Transcript of Suppression Hearing held on September 23, 2011 ("Sept. 23, 2011 Tr.") at 30-32.)

on the afternoon of November 24, 2010, police officers arrested him and his "friend Jose," later identified as Jose "Jay" Soler, *inside* an apartment on the first floor of 578 Williams Avenue. (ECF No. 16, Declaration ¶ 1 (emphasis added).)  Defendant further stated he had been living in the apartment a few months and that "[w]hen the police came," he and Mr. Soler "were hanging out and talking."  (*Id.* ¶ 2.)  In describing how the police entered the apartment, defendant stated that the police "pushed into the apartment, searched the apartment and arrested us," and that the police "came out with a gun which they said they found in one of the rooms."  (*Id.*)  Defendant asserted in his declaration that the police did not say they had a warrant, did not show defendant or Mr. Soler a warrant, and did not ask for permission to enter the apartment or search it.  (*Id.*)  Finally, defendant affirmed in his declaration that before he was arrested, he was not outside the apartment, was not holding a gun in his hand, and did not drop a gun to the ground.  (*Id.* ¶ 4.)  On August 2, 2011, the government filed an opposition to defendant's motion.  (*See* ECF No. 17, Memorandum in Opposition to Motion to Suppress Physical Evidence).

The court held a suppression hearing on September 23, 2011, at which the government presented a single witness, Officer Perrotta, whose testimony was consistent with that of the Complaint and Affidavit in Support of Arrest Warrant

described above.  Because the court found Officer Perrotta's
testimony regarding the circumstances of defendant's arrest and
seizure of the evidence to be credible, the court found that
there was probable cause to arrest the defendant and seize the
handgun as a search incident to arrest and denied defendant's
motion to suppress.  (Sept. 23, 2011 Tr. at 51; Mintute Entry
and Order dated September 23, 2011.)

On November 9, 2011, on the basis of the government's
disclosure of notes of a recent interview of Mr. Soler and of
paperwork from Mr. Soler's arrest by other members of Officer
Perrotta's SNEU team on November 24, 2010 at 578 Williams
Avenue, defendant moved to reopen the suppression hearing
without opposition from the government.  (ECF No. 38, Motion to
Suppress (Reopen Suppression Hearing).)  The court granted the
motion and held a supplemetary suppression hearing on November
21-22, 2011 at which the defendant called six witnesses.  Two of
these witnesses, NYPD Lieutenant Raymond Cotton and Officer
Jenica Nathaniel, were members of the SNEU team from the 75th
Precinct in East New York, Brooklyn and were on patrol in the
same vicinity as Officers Perrotta and Finnegan on November 24,
2010.  Three other defense witnesses, Maria Torres, Enid
"Jahaira" Acevedo, and Mr. Soler, were civilian witnesses who
resided at 578 Williams Avenue at the time of defendant's
arrest.  The defendant's final witness was Phillip Martin, an

investigator with the Federal Defenders of the Eastern District
of New York.  In rebuttal, the government called Officer
Perrotta's partner, Officer Finnegan, and Special Agent Ismail
Hernandez from the Bureau of Alcohol, Tobacco, and Firearms
("ATF").  After the November 23, 2011 suppression hearing, the
defendant submitted a post-hearing brief in support of his
renewed motion to suppress (*see* ECF No. 51, Memorandum in
Support of Motion to Suppress Physical Evidence ("Def. Mem.")),
the government submitted an opposition (*see* ECF No. 52,
Memorandum in Opposition to Motion to Suppress Physical Evidence
("Gov't Opp'n")), and the defendant submitted a reply brief (*see*
ECF No. 54, Reply to Response to Motion to Suppress Physical
Evidence ("Def. Reply")).

Having considered the appropriate burdens of
production and proof, the testimony of witnesses for the
government and defendant, the suppression hearing exhibits, the
parties' written submissions, and having resolved issues of
credibility, the court again denies defendant's motion to
suppress.  The court sets forth below the findings of fact and
conclusions of law upon which this determination is based.  *See*
Fed. R. Crim. P. 12(d) ("When factual issues are involved in
deciding a [pretrial] motion, the court must state its essential
findings on the record.").

## FINDINGS OF FACT

During the three days of suppression hearings, the court was presented with two vastly different and irreconcilable accounts of defendant's arrest and the seizure of the handgun – that of the NYPD witnesses and that of the civilian witnesses living in defendant's building at 578 Williams Avenue. Officers Perrotta and Finnegan testified that they arrested the defendant after observing him standing in an entranceway of 578 Williams Avenue with a firearm in his right hand that was visible in plain view from the street. In contrast, two of the civilian witnesses, Maria Torres and Jose Soler, testified, consistent with the defendant's declaration, that the police entered defendant's apartment without a warrant by breaking or kicking down the door to his apartment and that defendant did not have a handgun. The third civilian witness, Enid "Jahaira" Acevedo, testified that she was not in the building at the time of defendant's arrest.

As explained below, while there is some uncertainty surrounding the timing and location of defendant's arrest in relation to Mr. Soler's arrest, the court finds the police witnesses' testimony to be credible, consistent, and plausible. The civilian witnesses' testimony, however, was inconsistent and inherently suspect given the additional evidence of recorded conversations of defendant's efforts to fabricate testimony,

tamper with witnesses, and to obstruct justice in aid of his defense and his admissions that he possessed a handgun on the day in question. The court will present each of the factual accounts in turn.

## I.    The Police Officers' Testimony

At approximately 4:00 PM on November 24, 2010, Officers Lawrence Perrotta[2] and Sean Finnegan[3], members of the SNEU from the 75th Precinct in East New York, Brooklyn, were on duty in an unmarked car patrolling the vicinity of Williams Avenue and Newport Street in Brooklyn, New York, a drug prone area. (Sept. 23, 2011 Tr. at 3-8, 27; Tr. at 199, 201, 215; Gov't Ex. 1 (aerial view of vicinity).)[4] The officers were wearing street clothes, and Officer Perrotta was wearing his police badge underneath his clothing.[5] (Sept. 23, 2011 Tr. at 5-6; Tr. at 199.) After they parked their car on the northeast

---

[2] Officer Perrotta has been a police officer with the NYPD and assigned to the 75th Precinct for approximately five years. (Sept. 23, 2011 Tr. at 4-5.) He has been in the 75th Precinct's SNEU for approximately three years. (*Id.*)

[3] Officer Finnegan has been a police officer with the NYPD for approximately five years and is currently assigned to the Organized Crime Control Bureau and the Narcotics Bureau of Brooklyn, North Division. (Tr. at 198.) He was a member of the 75th Precinct's SNEU for approximately two years. (*Id.* at 221.)

[4] Unless specified as the "Sept. 23, 2011 Tr.," "Tr." refers to the suppression hearing transcript of November 21-22, 2011.

[5] Officer Finnegan testified that he was wearing his badge on a lanyard that hangs around his neck and that it was visible in plain view. (Tr. at 199.) He also noted that the decision of whether or not to have a badge visible while on patrol is "really like an issue of personal preference of how you want to walk around." (*Id.* at 219.)

corner of Williams Avenue and Newport Street, Officers Perrotta

and Finnegan proceeded "to do a walk-up" the sidewalk on

Williams Avenue in order to "take a look around and observe any

possible drug transactions on the street level." (Sept. 23,

2011 Tr. at 8-9; Tr. at 201-02.) The officers began walking

north on the sidewalk of the east side of Williams Avenue

towards Riverdale Avenue, and once they had walked approximately

three-quarters of the block between Newport Street and Riverdale

Avenue, the officers turned around and began walking south on

the sidewalk of the west side of Williams Avenue back towards

Newport Street. (Sept. 23, 2011 Tr. at 9, 13; *see* Gov't. Ex.

1.)

While the officers were walking south on the west side

of Williams Avenue toward Newport Street, Officer Perrotta

observed the defendant standing approximately one foot inside

the entranceway of 578 Williams Avenue with a firearm in his

right hand. (Sept. 23, 2011 Tr. at 10, 12-13, 15; Tr. at 206-

07.) Officer Perrotta ordered the defendant "to drop" by

shouting "police, don't move," and the defendant released the

firearm and it fell on the ceramic tile floor at the entrance of

the building. (Sept. 23, 2011 Tr. at 11, 15-16; Tr. at 203; *see*

Gov't. Ex. 4 (picture of open doorway of 578 Williams Avenue).)

Officer Finnegan then pushed the defendant approximately two to

three feet inside the vestibule of 578 Williams Avenue in order

to separate him from the firearm, the defendant was handcuffed, and Officer Perrotta secured the firearm, which was "ready to shoot."[6]  (Sept. 23, 2011 Tr. at 11-12, 16-17, 19; Tr. at 204-05.)  At the time Officer Perrotta observed the defendant with a firearm, the sun was still up and Officer Perrotta could see the defendant clearly.  (Sept. 23, 2011 Tr. at 14.)  Although Officer Finnegan did not observe defendant with a firearm in his right hand at the same time as Officer Perrotta, Officer Finnegan recalls hearing Officer Perrotta shout loudly and following him to the entrance of 578 Williams Avenue, where he took defendant into custody and recovered a firearm.  (Tr. at 203-06.)

    After the defendant and the firearm were secured, because it was a cool November day and the defendant was wearing "a thin layer on the top and a pair of shorts," the officers accompanied the defendant to his rear apartment on the first floor of 578 Williams Avenue to "g[e]t clothes to keep him warm."[7]  (Sept. 23, 2011 Tr. at 21-23, 44; Gov't Ex. 7 (defendant's post-arrest photo).)  The defendant led the officers to his apartment, which Officer Perrotta believes was

---

[6] Following NYPD protocol, Officer Perrotta subsequently labeled the firearm recovered by carving his initials "LP" into the gun.  (Sept. 23, 2011 Tr. at 18.)

[7] Officer Finnegan does not recall entering an apartment at 578 Williams Avenue, but believes it was possible that he entered the apartment "after the [arrest], but not before."  (Tr. at 207, 228.)

unlocked, and the officers performed "a general search [of the apartment] to make sure there was no one hiding or anything dangerous." (Sept. 23, 2011 Tr. at 23, 44-45.) The officers were in the apartment for less than five minutes, did not see anyone else in the apartment, and did not seize anything from the apartment except for clothing for the defendant. (*Id.* at 21-23, 46; *see* Gov't. Ex. 7.) Officer Perrotta did not make any other arrests that day (Sept. 23, 2011 Tr. at 41-43) and testified that he has recovered firearms from individuals on the street approximately fifteen times. (*Id.* at 24.)

While Officers Perrotta and Finnegan were on patrol near Williams Avenue and Newport Street on November 24, 2010 at approximately 4:00 PM, three other NYPD officers from the 75th Precinct's SNEU were also on patrol nearby in a separate police van. (Sept. 23, 2011 Tr. at 34, 37-38; Tr. at 5, 31-32, 200.) These NYPD officers were Lieutenant Raymond Cotton, who was a sergeant at the time of defendant's arrest ("Sergeant Cotton"), Officer Jenica Nathaniel, and Officer Jesus Diaz. (*Id.*) Officer Perrotta testified that these officers were not present when he observed defendant with a firearm, but that he had seen Officers Nathaniel and Diaz five to ten minutes prior to observing the defendant and then saw them again less than thirty minutes after defendant's arrest. (Sept. 23, 2011 Tr. at 38-39.) Officer Perrotta also testified that he did not recall

seeing any other people in the building when he walked out of
578 Williams Avenue with the defendant (*id.* at 46), and Officer
Finnegan has no independent memory of another arrest in the
vicinity of 578 Williams Avenue at or about the time that the
defendant was arrested.  (Tr. at 230-32.)

Sergeant Cotton testified that while he was in the
police van with Officers Nathaniel and Diaz, Officer Perrotta
used the "talk-around" channel on his police radio to tell
Sergeant Cotton to come to 578 Williams Avenue.  (*Id.* at 19-20.)
Sergeant Cotton, along with Officers Nathaniel and Diaz, then
drove the van to 578 Williams Avenue.  (*Id.* at 20.)  Upon his
arrival at 578 Williams Avenue to "verify the arrest" of the
defendant, Sergeant Cotton exited the van and observed Officer
Perrotta coming out of the hallway of 578 Williams Avenue with
the defendant.[8]  (*Id.* at 10, 20-21.)  Sergeant Cotton then joined
Officer Perrotta in walking the defendant to the police van
where he was going to be transported while Officer Perrotta
explained the circumstances surrounding the arrest.  (*Id.* at 10,
20-22.)  Although the exact time is uncertain, at some point
while he was putting the defendant in the van, Sergeant Cotton

---

[8]  Although Officer Finnegan testified that he did not
specifically recall other members of the SNEU team coming to the scene of
defendant's arrest at 578 Williams Avenue, he believes it was "very likely"
because, consistent with Sergeant Cotton's testimony, "if you have an arrest,
the sergeant has to verify every arrest and come to the scene."  (*Id.* at
229.)

turned around and saw that Officer Nathaniel had arrested an individual identified as Jose Soler for Criminal Possession of Marijuana in front of 578 Williams Avenue.[9] (*Id.* at 10-12, 22-23.) While Officer Nathaniel did not recall the arrest of Mr. Soler[10], after having her recollection refreshed by the arrest report, she testified that she observed Mr. Soler smoking a marijuana cigarette while he was standing on the top step of 578 Williams Avenue. (*Id.* at 35-36.) Officer Nathaniel does not recall seeing Officers Perrotta or Finnegan at 578 Williams Avenue that day. (*Id.* at 36.)

The NYPD arrest report for Mr. Soler's November 24, 2010 arrest, which was completed by Officer Nathaniel and approved by Sergeant Cotton, states that the arrest location is the "front of 578 Williams Avenue" and contains a time of occurrence of 4:05 PM and a time of arrest of 4:10 PM. (*Id.* at 16-17; Def. Ex. C.) The arrest report also states that Mr. Soler "was observed in possession of a quantity of marijuana during a SNEU operation in plain view." (Def. Ex. C.) The complaint report for defendant's November 24, 2010 arrest, which was completed by Officer Perrotta and also approved by Sergeant

<hr />

[9] According to notes taken by Special Agent Hernandez during an interview with Sergeant Cotton on November 10, 2011, Sergeant Cotton said that he saw Officer Nathaniel and Mr. Soler "coming out" of 578 Williams Avenue. (Tr. at 276.) Sergeant Cotton does not recall telling Special Agent Hernandez this fact. (Tr. at 13.)

[10] Officer Nathaniel testified that the 75th Precinct's SNEU team makes approximately 80 marijuana arrests per month. (*Id.* at 36.)

12

Cotton, similarly states that the occurrence location is the "front of 578 Williams Avenue" and has an occurrence time of 4:05 PM through 4:10 PM. (Tr. at 17-18; Def. Ex. D.) The narrative description in the complaint report for defendant's arrest, which states that defendant "was observed [in] the entranceway of 578 Williams with a loaded firearm" that he "was holding in his hand in public view," is also consistent with Officer Perrotta's testimony described above. (Def. Ex. D.)

Additionally, Sergeant Cotton and Officer Finnegan testified that SNEU officers are not trained to perform forced entries into an apartment where a warrant has been issued and that they do not perform such entries. (Tr. at 24-25, 208-09, 211.) Rather, such forced entries are executed by an Emergency Service Unit ("ESU") consisting of six to eight officers, and the ESU officers typically have protective helmets, special bullet proof vests, rifles, and riot shields. (*Id.* at 25-27, 209-10.) If such safety and tactical precautions are not taken, Officer Finnegan testified that a breached entry would be an extreme hazard to an officer's safety. (*Id.* at 210.) Both Sergeant Cotton and Officer Finnegan credibly testified that the SNEU team on patrol near 578 Williams Avenue on November 24, 2010, which included Sergeant Cotton and Officers Perrotta, Finnegan, Nathaniel, and Diaz, did not have any such equipment that day and did not kick down a door at 578 Williams Avenue or

execute a warrant at that premises on that day.  (*Id.* at 26-27, 207-08, 212-13.)  Indeed, Officer Finnegan testified that officers executing a breached entry on a search warrant would use a variety of breach tools, including a battering ram, sledge hammer, or a Kelly tool, to open a door, and he has never seen a police officer kick down a door.  (*Id.* at 211-12, 224.)

## II.    The Defense Witnesses' Testimony

As described above, in support of his motion to suppress, defendant submitted a declaration stating that, on the afternoon of November 24, 2010, police officers "pushed into" his apartment on the first floor of 578 Williams Avenue, searched the apartment, arrested defendant and Mr. Soler inside the apartment, and "came out with a gun which they said they found in one of the rooms."  (Declaration ¶ 2.)  Defendant further stated that the police did not have a warrant and that he was not standing outside the apartment with a gun in his hand. (*Id.* ¶¶ 2-4.)

Maria Torres lives in an apartment on the second floor of 578 Williams Avenue with her granddaughter and grandson, and she testified at the suppression hearing pursuant to a defense subpoena.  (Tr. at 44, 53-54.)  Ms. Torres' daughter, Enid "Jahaira" Acevedo, lives in the first-floor apartment at the front of 578 Williams Avenue and defendant lives in the rear first-floor apartment.  (*Id.* at 49, 75.)  Ms. Torres has known

14

the defendant for approximately three-and-a-half years as a
neighbor, and although Ms. Torres does not know defendant's
actual name, she has heard her daughter refer to the defendant
as "Samurai," personally calls him Samuel, and considers him "a
friend, respectful person, a good person who minds his own
business, a friend." (*Id.* at 46, 52.)

Ms. Torres testified that on November 24, 2010 before
defendant's arrest, she was at home in her apartment at 578
Williams Avenue when she heard "loud bangings on the . . . door
to the entrance of the building." (*Id.* at 47.) She was
frightened because her grandson was outside, and so she opened
the door to her apartment and spoke loudly, asking "who is it."
(*Id.*) The people at the entrance to the building identified
themselves as police, asked Ms. Torres where she lived, to which
she responded the second floor, and the police said that "it was
okay that they were going to go to the rear apartment." (*Id.* at
47, 63-64.) Ms. Torres then opened the door for the police, who
were in "civilian clothes," and then she returned to her
apartment upstairs and closed the door. (*Id.* at 48-49, 63-66.)
Ms. Torres could not recall exactly how many police officers
were at the front door to the building, but she testified that
it was more than two and closer to "three or four" officers.
(*Id.* at 64-65.)

When she was back in her apartment, Ms. Torres testified that she heard the police "knocking loudly in the rear door and I also heard when it was very strong and they broke the door down" to defendant's apartment.  (*Id.* at 49-50.)  During direct examination, Ms. Torres stated that she saw the police break down the door "[b]ecause at one point I opened the door, I went out into the hall and I looked and they were breaking it down with something that they brought with them, something they used to break down stairs."  (*Id.* at 50.)  During cross-examination, Ms. Torres confirmed that the police were using a battering ram to knock down the door to defendant's apartment (*id.* at 66), that she saw the police knock in the door (*id.*), and that she could see a battering ram in the hallway when she looked down the stairwell (*id.* at 68-70).  When she was asked once again, however, whether she saw the police "actually hit the door with that battering ram," she replied "No, I can't say that, no, because I'd be lying, no, but it was there - - that was there, and it must have been some reason it was there because they knocked down the door."  (*Id.* at 67, 70.)

When Ms. Torres did not hear any further noise downstairs, she went to her window and testified "that's when I saw they were taking out Samuel and the other fellow in cuffs" to "little vans."  (*Id.* at 51.)  After the police had left the building with defendant, Ms. Torres testified that she went

downstairs and saw that the door to defendant's apartment was
"broken" in that "the frame was loose from the door, that it was
off its frame" and "they sort of like put it to the side." (*Id.*
at 50-51, 67.) Finally, Ms. Torres testified that she does not
know Mr. Soler and has not been contacted by the defendant or
any of his friends and family since his arrest. (*Id.* at 51-52.)

Mr. Torres' daughter, Ms. "Jahaira" Acevedo, who has
known the defendant for approximately three years, also
testified at the suppression hearing pursuant to a defense
subpoena. (*Id.* at 76, 82.) Ms. Acevedo confirmed that she was
not present when the police arrested the defendant, and that Ms.
Torres had called her while she was at a nail salon to tell her
that the police were downstairs in the apartment building. (*Id.*
at 71, 77.) After her nails had dried, Ms. Torres testified
that she returned to 578 Williams Avenue – after the police had
left - and observed that the front entrance door to the building
"was a little dent, but the lock didn't want to lock," and that
with respect to defendant's apartment door, "the whole frame of
the door was out." (*Id.* at 77-79.) Ms. Acevedo also testified
that she called Anthony Lugo or "Ank", Mr. Soler's cousin (*id.*
at 89) who lived with the defendant and "the other guy" whose
name she did not know, in Apartment 1R, at 578 Williams Avenue,
and told him "the cops went in his house, and the door was out
of the hinges and he needed to come to the house." (*Id.* at 77-

17

78, 89, 93.) Finally, Ms. Acevedo testified that she has not
spoken with the defendant since his arrest. (*Id.* at 79.)

Because Ms. Acevedo was not present when the police
arrested the defendant, and therefore has no personal knowledge
of the circumstances surrounding defendant's arrest, the court
does not credit her testimony.[11] In addition, Ms. Acevedo is the
only witness to describe a problem with the front entrance door
to 578 Williams Avenue as dented and unable to lock, thereby
suggesting that the police damaged the door, but Ms. Torres
testified that she opened the front door for the police. (*Id.*
at 48-49.)

Mr. Soler testified that he knew the defendant through
his cousin, Anthony Lugo, and that he had known the defendant
for a "few months" prior to the time of defendant's arrest.
(*Id.* at 88-89.) Mr. Soler sometimes called the defendant
Samurai because he likes knives and swords and "always [has] a
knife or sword with him." (*Id.* at 107.) Mr. Soler testified
that he, Mr. Lugo, Mr. Lugo's girlfriend and her daughter, and
the defendant were sharing the rear, first-floor apartment at
578 Williams Avenue, which Mr. Soler described as a two-bedroom

---

[11] Ms. Acevedo also testified that she was arrested in July 2010
because "[t]he cops invaded [her] house" without a warrant and "tried to
charge everybody who was in the house for one pill [of Vicodin]." (Tr. at
80-81, 84.) Although the charges against Ms. Acevedo and her family were
dropped (*id.* at 81), she appeared to the court to harbor some anti-police
bias because of this alleged invasion of her house. In addition, Ms. Acevedo
has multiple convictions for having an open bottle of alcohol in public.
(*Id.* at 81-82.)

apartment.  (*Id.* at 93-94, 110.)  Both the defendant and Mr.

Lugo had their own bedrooms, with the defendant's bedroom

located two feet from the entrance to the apartment, and Mr.

Soler slept in the living room.  (*Id.* at 94, 96.)

On November 24, 2010, the day of the defendant's and

Mr. Soler's arrests, Mr. Soler testified that he and the

defendant[12] were smoking marijuana in the living room of the

apartment and watching television for approximately ten minutes

before the police entered the apartment.  (*Id.* at 91-92, 95,

115, 142-43.)  At some point while they were smoking, the

defendant and Mr. Soler decided that they were "going to go out"

and the defendant went to his room to change clothes, leaving

Mr. Soler in the living room to smoke a joint by himself.  (*Id.*

at 91, 95, 115, 146-47.)  Shortly thereafter, while the

defendant was in his room, Mr. Soler testified that he heard

"banging on the door" that continued for approximately a minute

and began "low and then it just kept getting higher and higher"

and was very loud by the end.  (*Id.* at 97, 149-51; *see also id.*

at 151 ("At first [the banging] sounded like somebody was

knocking on the door and then it got harder and harder like a

foot kicking.").)  Mr. Soler then "got up to see who was banging

on [the] door," (*id.* at 97), and by the time Mr. Soler "got

halfway towards the door, [the police] already kicked it in" and

---

[12] Mr. Soler testified that Mr. Lugo was out of town on November 24, 2010.  (Tr. at 95, 146.)

had "rushed [defendant] and pushed him on the floor and put cuffs on him."[13]  (*Id.* at 97; *see id.* at 94, 117-18.)

On cross-examination[14], Mr. Soler conceded that he never actually saw the police kick the door open but assumed that they did so, and Mr. Soler clarified that the first time he saw the police they were pushing the defendant to the floor. (*Id.* at 117-18.)  In addition, Mr. Soler did not hear any shouting or any other noises coming from the first-floor hallway of 578 Williams Avenue prior to the banging on his apartment door (*id.* at 152), which appears to be inconsistent with Ms. Torres's testimony that she heard banging on the front door to the building (*id.* at 47).  Mr. Soler also testified that the police officers did not identify themselves as police when they entered the apartment.  (*Id.* at 152-53.)

Mr. Soler then testified that the police subsequently arrested him:  "They put the cuffs on me, they picked me up and pushed me towards the living room, that they grabbed me, like

_____

[13] Mr. Soler testified that he believed the police entered the apartment between 1:40 PM and 2:00 PM on November 24, 2010 because he was waiting to watch The Haunting which begins at 2:00 PM.  (Tr. at 173-74.)  Defense counsel attempted to correct this inaccurate time frame on the record to no avail.  (*Id.* at 175-77.)

[14] On the advice of counsel, Mr. Soler asserted his Fifth Amendment right against self-incrimination to questions regarding (1) where he had obtained the marijuana (Tr. at 112), (2) whether he and the defendant had smoked marijuana earlier in the day (*id.* at 116), and (3) his conversations with Melissa Melendez, the defendant's girlfriend at the time, with respect to defendant's arrest (*id.* at 126).  As noted by the government, the prosecutor was unable to fully cross-examine Mr. Soler.  (Gov't Opp'n at 38-39.)  In making credibility determinations, the court has taken this fact into account.

pushed me towards the living room.  Like they put us in separate rooms." (*Id.* at 97.)  Mr. Soler described seeing five plainclothes police officers – four male officers and one female – and some of them were attending to the defendant and the others were attending to Mr. Soler.  (*Id.* at 98, 120.)  Mr. Soler testified that the officers were not wearing helmets or carrying "long guns," and that, contrary to Ms. Torres' testimony, they did not have a battering ram.  (*Id.* at 120.) Notably, Mr. Soler testified that he did not see a gun on the day of his and the defendant's arrests, and that he has never seen the defendant with a gun.  (*Id.* at 97, 119, 123.)  After they were arrested, Mr. Soler testified that he and the defendant were placed in a police transport van and taken to the 75th Precinct, and then subsequently to Central Booking.  (*Id.* at 98-99, 121-22.)

In connection with his arrest on November 24, 2010, Mr. Soler was subsequently charged with Criminal Possession of Marijuana and was released the next day, on November 25, 2010. (*Id.* at 99-101.)  Mr. Soler then returned to his apartment at 578 Williams Avenue the same day he was released and described his apartment door as "broken in two . . . [b]asically, like the metal parts from the side of the walls were like ripped and pushed in, and the door was like bended in, like in the middle of the door, it was bended inways."  (*Id.*)  After a conversation

with the defendant, Mr. Soler testified that he took pictures of the damaged door, and that when he developed the pictures at the request of Special Agent Hernandez, the pictures did not turn out properly. (*Id.* at 101-04, 126-27; *see* Def. Ex. F (contact sheet for the roll of film developed that does not show a damaged door).) In addition, after a conversation with defendant, Mr. Soler inquired about a surveillance camera across the street from 578 Williams Avenue "that wasn't facing to [defendant's] building." (Tr. at 126-27.)[15]

---

[15] The defendant introduced a series of excerpts from phone conversations recorded while he was in custody at Rikers Island and the Metropolitan Detention Center, in which he was enlisting the assistance of Melissa Melendez, his girlfriend at the time, Mr. Soler, and others to obtain the video footage from three video cameras: two video cameras at the day care center across from 578 Williams Avenue and a police camera on the corner of Williams and Riverdale Avenues. (*See* Def. Ex. H1 at 1-5; Def. Ex. I1 at 1; Gov't Ex. 22A at 1-4.) Defendant believed that the footage "will definitely show that I'm not there waving a gun around the way they saying." (Def. Ex. H1 at 1; *see also* Def. Ex. I1 at 1 ("[I]f you get the footage from that police camera, it's gonna, it's gonna completely show that I wasn't there.").) The defendant served a subpoena on the NYPD for the video recording from the police camera on the day of defendant's arrest (Def. Ex. G), but did not enter any such footage into evidence at the suppression hearing. According to testimony from Special Agent Hernandez, the police camera, however, is located three-quarters of a block from 578 Williams Avenue, "just points to the immediate corner [at Williams Avenue and Riverdale Avenue] where it's located at," and does not cover the area of the front door of 578 Williams Avenue where defendant was arrested. (Tr. at 252-53.) Similarly, the video cameras at the day care center across from 578 Williams Avenue only point toward the front door of the day care center and provide a live feed used "just to see who is standing in the doorway prior to buzzing anybody in." (*Id.* at 255-58.) Although it appears from the recordings that defendant believed

22

Mr. Soler resolved his Criminal Possession of Marijuana charge by pleading guilty to disorderly conduct. (*Id.* at 178.) Mr. Soler, however, was subsequently arrested on two more occasions for possession of marijuana (*id.* at 99) and has been arrested a total of ten times over his lifetime (*id.* at 109). On cross-examination, Mr. Soler conceded that he has had several negative experiences with the police and that he does not like the police very much. (*Id.* at 167.) In addition, despite having scheduled a meeting with the federal prosecutor on the case and receiving a reminder, Mr. Soler did not attend the meeting and did not return any of Special Agent Hernandez's calls following up on the meeting. (*Id.* at 167-69.) Rather, Mr. Soler met with the defendant's attorney and his investigator on multiple occasions, both in-person and via telephone, and he went to 578 Williams Avenue with the defendant's investigator to show him what happened on the day he and the defendant were arrested. (*Id.* at 169-71.) Based on Mr. Soler's testimony and his efforts to assist the defense while being unresponsive to the government, it is likely Mr. Soler has an anti-police bias. Moreover, in light of the recorded conversations of the defendant indicating his attempts to enlist witnesses to lie and

the video footage would corroborate his declaration, because there is no video footage available to aid either party, the court finds that these excerpts carry minimal probative value when considered in the context of the entire set of recordings.

admitting that he had a gun, the court does not find Mr. Soler's testimony to be credible.

## III. Defendant's Post-Arrest Statements

Through Special Agent Ismael Hernandez, the government introduced a series of recorded phone calls made while defendant Vasquez was in prison at Rikers Island shortly after his arrest. (*See* Tr. at 236-39.) These calls are direct evidence of the defendant's admissions that he had a gun, and his efforts to convince others to lie on his behalf and to tamper with witnesses in order to fabricate a cohesive story regarding the circumstances of his arrest among himself and the other defense civilian witnesses, including Mr. Soler and Ms. Acevedo.

The first recording, between the defendant and Melissa Melendez, his girlfriend at the time (*see id.* at 108), was made at approximately 6:32 PM on November 26, 2010 — two days after the defendant's arrest — while the defendant was at the Otis Bantum Correctional Center at Rikers Island:

> VASQUEZ:  Listen. I need -- did the lawyer call you today?
>
> MELISSA: No.
>
> [ . . .]
>
> VASQUEZ:  . . . if he didn't call you today, he's gonna try to call you Monday.  Don't forget what you gotta say.
>
> MELISSA:  Yeah, I know.

MELISSA:  Alight?  Be like, at no time was I
in front of the building waving no gun.  Be
like, he never had a gun.  We was in the
building, I'm saying, we was in the
apartment, watching TV when they kicked the
door in, be like they cuffed me, they cuffed
Jay, and that they told you to go step
outside.  But that at no time did I ever
have a gun and that there was never a gun in
the apartment.  Be like all that shit about
him being in the outside or whatever, that
nothing.  And then he's going to ask you are
you willing to come and testify in front of
a grand jury. You tell him, yeah, I mean, if
you want to.

MELISSA:  Mmm-hmm.

VASQUEZ:  Would you do that for me?

MELISSA:  Yeah.

VASQUEZ:  That's why I love you.

(Gov't Ex. 21A at 1-2.)  Subsequently, the following day, on

November 27, 2010, at approximately 7:36 PM, the defendant had

another conversation with Ms. Melendez regarding her anticipated

testimony:

VASQUEZ:  . . .  Ummm, listen, I'm pretty
sure this lawyer's going to call you
tomorrow.  You got the story straight,
right?

MELISSA:  Uh-huh.

VASQUEZ:  Remember, we was in the crib
watching TV, they kicked in the door, we
never had no gun.  You know, shit like that.

MELISSA:  Mmm-hmm.

VASQUEZ:  Alright? If anything, be like,
yeah, there was probably some weed in the

25

ashtray.  That's about it.  But there was
never no gun in the house.  He was never
outside waving no gun or nothing like that.
They're going to ask you, are you willing to
come and testify and all that shit?  You say
yeah.  They might not even call you to
testify.  'Cause, if I go to the grand jury,
or, like, if I, that's if I go to trial that
they gonna ask you to testify.  It might not
even go to trial.  But as long as on paper
it says you're willing to come testify, then
that works on my behalf.  That someone could
testify, back up my story and all this other
shit.

MELISSA:  Yeah.

[. . .]

VASQUEZ: . . .  Listen, I'm sorry I gotta ask you
to do this.  I don't want to put you through
this.  Like right now, in the beginning is going
to be the crucial part, because I'm taking the
steps, you know, for the court and all that.
Once the ball starts rolling then it gets easier,
there's not going to be so much bullshit.  Just
handle this now, and everything, once everything
is done and everything is good, we don't gotta do
nothing else.  Just, whatever happens from there
happens from there.

(Gov't Ex. 22A at 7-9.)  Finally, another two days later, on

November 29, 2010, at approximately 5:52 PM, the defendant had a

third conversation with Ms. Melendez about her testimony:

VASQUEZ:  Listen, whenever they ask you,
like if you go to the grand jury or you
write a statement, you're going to tell them
that we was in the crib, we watching TV, we
heard kicks.  If they ask how many, you say
like around four or five kicks.  Be like, we
don't, I don't know.  It happened so fast.
Like four or five kicks.  Be like, uh, they
came, they threw . . .

MELISSA:  I said like three.

VASQUEZ:  You said like three?

MELISSA:  Mmm-hmm.

VASQUEZ:  Alright, you. That's good, that's good.  Now I know that's what you said.  I can say the same thing.

MELISSA:  Three or four, something . . .

VASQUEZ:  Yeah, like three or four kicks. That's good. That's good.  As long as the story matches up somehow, that's good.  And you just be like that, when they came in, they told us to put our hands up, they came in with guns drawn, they told us to put our hands up.  Be, like, I put my hands up, and they threw me on the floor. Be like, they threw me on the floor, and proceeded to cuff me.  Once they cuffed me, right there, they started walking you out the door.  And then, remember, you gotta say, I'm positive, be like, I'm positive he never had a gun.  We got there together.  He was with me all day. He never had a gun.  You know what I'm saying?  So . . .

MELISSA: Mmm-hmm.

VASQUEZ: Hopefully that will work.

(Gov't Ex. 24A at 1-2.)  These disturbing phone calls just days

after the defendant's arrest reveal the defendant attempting to

convince Ms. Melendez to perjure herself in front of the grand

jury by testifying, contrary to the testimony of all the

witnesses at the suppression hearing and the defendant's own

declaration, that she was present in the defendant's apartment

at 578 Williams Avenue at the time of his arrest and observed

the police kick down the door and simply handcuff the defendant and Mr. Soler without ever having seen a firearm.[16]

The defendant not only attempted to fabricate a story with Ms. Melendez, but also sought to coordinate his story with Mr. Soler or "Jay" and Ms. Acevedo or "Jahaira."[17] During the November 27, 2010 call with Ms. Melendez, Ms. Melendez handed the phone to Mr. Soler and the following exchange ensued:

> VASQUEZ: I'm going to the grand jury on Tuesday, and my lawyer is going to call Melissa tomorrow to get her side of the story, and all that.
>
> SOLER: Uh-huh.
>
> VASQUEZ: So she needs to tell him all that. Like, to tell him, listen, we got this witness and this witness, and we possible got this footage. And all that's going to help me.
>
> SOLER: 'Cause I know, I know, like, the whole building knows about it. As soon as they kicked the door open. Jahira says that's what she told Ank [Mr. Lugo]. And then that what she had called her mom, too, at the same time. Right after she had called Ank.

---

[16] The defendant seeks to explain away these phone calls, "under the most damning interpretation," as the defendant "ask[ing] his girlfriend to bear false witness to a true version of events," and then implicitly argues that the court should not to make an adverse finding as to credibility. (Def. Mem. at 17 n.6.) The defendant further contends that "if he were making up this story, he would have said so in one of his many recorded conversations." (*Id.* at 17.) Contrary to the defendant's position, the court finds that an adverse credibility determination is required where there is direct evidence of the defendant soliciting others to bear false witness and actually instructing those potential witnesses how to testify. Furthermore, the defendant arguably admitted that his story was false when he said that "[o]nce the ball starts rolling it gets easier, there's not going to be so much bullshit." (Govt.'s Ex. 22A at 9.)

[17] "Jahaira" is spelled "Jahira" in Government Exhibit 22A.

> [ . . . ]
>
> VASQUEZ: Just make sure Melissa got your
> number or whatever like that, so whenever
> she speaks to the lawyer, she can also tell
> him, you know what I'm saying, you're also
> going to be a witness, and all that other
> stuff.  He can take down your name and
> number and all that.  And when he calls you,
> you basically tell him the story.  We was
> chillin' in the crib.  We wasn't doin'
> nothing. You tell him there was never no
> ratchet in the crib.
>
> SOLER: I know.
>
> VASQUEZ: Just tell him, there was never no
> ratchet in the crib!
>
> SOLER: I got you my n_____.
>
> VASQUEZ: Good looking big boy.
>
> SOLER: Alright

(Gov't Ex. 22A at 2, 5-6.)  The fact that defendant is compelled

to instruct Mr. Soler to tell "the story" described above, which

Mr. Soler states that he "know[s]" and which is consistent with

defendant's declaration and the conversations he had with Ms.

Melendez, strongly suggests Mr. Soler's testimony is a

fabrication.  Additionally, as the government points out, Mr.

Soler's remark that Ms. Acevedo "had called her mom" after

speaking with Mr. Lugo directly contradicts the testimony of Ms.

Acevedo and Ms. Torres, who both testified that it was Ms.

Torres who called Ms. Acevedo at the nail salon to tell her

about the purported police entry into 578 Williams Avenue, and

that Ms. Acevedo later called Mr. Lugo after she returned home. (Tr. at 71, 77; *see* Gov't Opp'n at 17 n.10.)

Defendant's "story" is further belied by his attempt on November 27, 2010 to have Ms. Melendez contact Ms. Acevedo ("Jahaira") to give false testimony about defendant's arrest even though, as Ms. Acevedo testified, she was not present during the arrest:

> VASQUEZ: Umm. The lawyer, I'm pretty sure the lawyer is going to call you tomorrow. Take, tell Jay, don't forget, tell Jay to call Ank [Mr. Lugo] and get Jahira's number, alright?
>
> MELISSA: Alright.
>
> VASQUEZ: You speak to Jahira. Don't wait for somebody else to do it ma! Don't wait for somebody else do it . . .
>
> MELISSA: OK.
>
> VASQUEZ: . . . because now I ask you to do it and you ask somebody else to do it, and we gotta wait for them to do it, for you to get the information, to give it to me. You know, when the lawyer calls you, you gotta be able to tell him, well, listen, I was there, la la la. We also have the tenants from the building. We have the lady, tenants from the building they're willing to testify. They're willing to say this, they're willing to say that. They going to ask you, what's her name, what's her number? So you speak to Jahira, and you call Jahira. Hi, it's Melissa, Samurai's girl. Ahh, listen, he wants to know that if you're willing to give a statement for him on his behalf 'cause the cops are lying. The cops are doing this and that and that.

MELISSA:  Yeah.

        VASQUEZ:  Right?  Then, you work out the
        story with her.  Listen, he wants you to say
        that the cops came in the house.  They
        kicked the door in, whatever, like that.  As
        far as - - you tell her, listen, they ever
        ask you if he was outside, if he ever had a
        gun, be like that you never saw him with a
        gun.  Stuff like that.  To your knowledge,
        he never had a gun.  There was never a gun
        there.  You know, stuff like that.  As long
        as she say that she saw, that she physically
        saw the cops coming in and break the door
        down, then that just, that alone works on my
        behalf, 'cause it doesn't put me where
        they're saying that I'm at.

        MELISSA:  Alright.

        VASQUEZ:  You understand?

        MELISSA:  Yeah.

(Gov't Ex. 22A at 9-11.)  The above conversation speaks for

itself.  Indeed, the defendant instructs Ms. Melendez how to

start the conversation with Ms. Acevedo and to "work out the

story with her," and he details exactly what Ms. Acevedo's

testimony should be to corroborate defendant's declaration and

the testimony of Mr. Soler.  (*Id.*)  Defendant specially

instructs Ms. Melendez to tell Jahaira that he "wants [Jahaira]

to say that the cops came in the house . . . [t]hey kicked the

door in" because "that alone works on my behalf, 'cause it

doesn't put me where they're saying that I'm at," and that

Jahaira "never saw [defendant] with a gun."  (*Id.*)  While Ms.

Acevedo ultimately did not testify that she was present at 578

31

Williams Avenue during defendant's arrest, the defendant's efforts to tamper with her testimony undermine her credibility as a witness.

As demonstrated in these recorded phone conversations, the story propounded by the defendant in his declaration and by the civilian witnesses through their testimony, is inherently unreliable because the defendant has clearly attempted to recruit others to fabricate testimony that corroborates his account. Additionally, the defendant attempted to ensure "the story matches up somehow" (Gov't Ex. 24A at 1) by harmonizing the circumstances surrounding his arrest among himself and two of the three civilian witnesses, all of whom lived within one floor of each other in the same building at the time of his arrest. Indeed, the defendant is heard in these phone conversations attempting to synchronize the number of "kicks" on the door that were heard prior to the police entering his apartment. (*Id.* at 1-2.) While there is no evidence of defendant attempting to influence the testimony of Ms. Torres[18], and the court otherwise found her testimony to be mostly credible, the fact that Ms. Torres is closely connected to

---

[18]    As Special Agent Hernandez testified, the government was unable to listen to more than fifteen other phone calls between the defendant and Ms. Melendez during the period between January 19, 2011 and March 26, 2011 while defendant was in custody at the Metropolitan Detention Center ("MDC") in Brooklyn, New York because the MDC only maintains recordings of phone calls for 180 days.  (Tr. at 250-52.)

defendant's efforts at fabricating testimony through her daughter, Ms. Acevedo, renders her testimony suspect as well.

Finally, defendant's account of his arrest is most strongly undermined by his admission in three separate phone calls that he indeed did have a gun in his possession when he was arrested. The first admission by defendant occurs in a conversation five days after his arrest and three days after his conversation on November 26, 2010 with Ms. Melendez, in which he tells her to say they were in his apartment on the day of his arrest. (*See* Gov't Ex. 21A at 1-2.) On November 29, 2010, at approximately 12:24 PM, the defendant and an unidentified woman ("UF2") discuss the following:

> UF2: And what happened? Que paso?
>
> VASQUEZ: They raided the house.
>
> UF2: They only took you?
>
> VASQUEZ: They took me and my roommate Jay. It was only me and him there.
>
> UF2: Awww . . .
>
> VASQUEZ: And they kicked in, yeah, they started kicking in the door, and I'm like, what the fuck? And I thought it was drama. Thought it was beef.
>
> UF2: And you pulled out.
>
> VASQUEZ: Yeah, so I grabbed the gun and I started walking to the door and when I start walking to the door . . .
>
> UF2: They saw it on you.

> VASQUEZ:  . . . the door opened, they kicked
> the door in, and the n_____'s right there,
> and I had to throw the gun on the floor.
> They got me, they got me.  But they did it
> dirty, because they didn't have no warrant,
> no nothing.

(Gov't Ex. 23A at 1-2).  Similarly, in another conversation at

approximately 6:08 PM on the same day, the defendant told an

unidentified woman that "[t]hey raided my crib . . . I know,

they came in my crib like fucking five o'clock in the afternoon,

they kicked my door down.  They caught me with a gun in my

room."  (Def. Ex. H1 at 5.)  Although these accounts are

consistent with the defendant's contention that the police

entered his apartment without a warrant and by kicking down the

door, the defendant's admission that he did in fact possess a

gun directly contradicts his declaration and explains the

statements he made to the defense civilian witnesses over the

phone about the "story" they were to tell, indicating once again

that the defendant's account cannot be credited.

The third conversation occurred on April 25, 2011 at

approximately 10:37 AM between the defendant and his mother,

during which the defendant explained the following:

> Honestly speaking, I believe that it was in
> God's plan for me to come to jail because,
> the way that I was before I got locked up
> mommy, I was, I was twisted, you know,
> between the drugs and the problems in the
> street, and all that [(in Spanish) I was . .
> . they were going to kill me or I was going

> to kill somebody]. Literally, it was to the
> point. *You know what I'm saying? I'm*
> *running around with things on, you know,*
> *with guns and all types of stuff.*

(Gov't Ex. 25A at 1 (emphasis added).)  The defendant then went
on to describe a violent argument with Ms. Melendez's neighbor
shortly before his arrest that had escalated "to the point where
I was either going to kill him or he was going to try to kill
me.  One or the other."  (*Id.* at 2.)  This latter incident also
provides a motive for why defendant possessed a gun on the day
of his arrest and explains why, as Officers Perrotta and
Finnegan testified, he was standing at the entrance to his
building with a firearm in his hand.

## DISCUSSION

"On a motion to suppress evidence in a criminal trial,
once [defendant] establishes a basis for his motion, the burden
rests upon the Government to prove, by a preponderance of the
evidence, the legality of the actions of its officers.  *United*
*States v. Wyche*, 307 F. Supp. 2d 453, 457 (E.D.N.Y. 2004)
(citations omitted); *see also United States v. Matlock*. 415 U.S.
164, 178 n.14 (1974) ("[T]he controlling burden of proof at
suppression hearings should impose no greater burden than proof
by a preponderance of the evidence.").  "Deciding whether that
burden has been met is not a mechanical, quantitative exercise;
rather, the result turns on whether the trier of fact has been

persuaded, even if only by the tiniest margin, that the requisite facts have been established." *United States v. Irving*, 09-CR-570 (JG), 2009 U.S. Dist. LEXIS 110178, at *4 (E.D.N.Y. Nov. 25, 2009) (citing *In re Winship*, 397 U.S. 358, 367-68 (1970)).

The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures," U.S. Const. Amend IV, "and this usually requires the police to have probable cause or a warrant before making an arrest." *Herring v. United States*, 555 U.S. 135, 136 (2009). In a "long line of cases, [the Supreme Court has] said that when an officer has probable cause to believe a person committed even a minor crime in his presence, the balancing of private and public interests is not in doubt. The arrest is constitutionally reasonable." *Virginia v. Moore*, 553 U.S. 164, 171 (2008) (citations omitted); *see also United States v. Watson*, 423 U.S. 411, 418 (1976) ("The cases construing the Fourth Amendment thus reflect the ancient common-law rule that a peace officer was permitted to arrest without a warrant for a misdemeanor or felony committed in his presence as well as for a felony not committed in his presence if there was reasonable ground for making the arrest." (citations omitted)).

"Probable cause exists for an arrest if the totality
of the circumstances, as viewed by a reasonable and prudent
police officer in light of his training and experience, would
lead that police officer to believe that a criminal offense has
been or is being committed." *United States v. Moreno*, 897 F.2d
26, 31 (2d Cir. 1990) (citations and quotation marks omitted);
*see also Savino v. City of New York*, 331 F.3d 63, 76 (2d Cir.
2003) ("Probable cause exists when an officer has 'knowledge or
reasonably trustworthy information sufficient to warrant a
person of reasonable caution in the belief that an offense has
been committed by the person to be arrested.'" (citation
omitted)).

"Once an item of an incriminating nature is observed
in plain view, police officers have probable cause to arrest a
suspect." *United States v. Cruz*, 314 F. Supp. 2d 321, 330
(S.D.N.Y. 2004) (citation omitted); *see also United States v.
Fields*, 113 F.3d 313, 321 (2d Cir. 1997) ("Although society
generally respects a person's expectations of privacy in a
dwelling, what a person chooses voluntarily to expose to public
view thereby loses its Fourth Amendment protection.  Generally,
the police are free to observe whatever may be seen from a place
where they are entitled to be." (citations omitted)).  "[A]
warrantless search of a suspect's person may also be conducted
incident to a valid arrest consistent with the Fourth

Amendment." *Cruz*, 314 F. Supp. 2d at 330 (citing *New York v. Belton*, 453 U.S. 454, 457 (1981)); *see also Wilson v. Aquino*, 233 Fed. Appx. 73, 76 (2d Cir. 2007) ("Warrantless searches incident to arrest have long been deemed reasonable in order to disarm a defendant and prevent his destruction of evidence." (citing *Chimel v. California*, 395 U.S. 752, 763 (1969))).

In carefully considering the evidence the parties adduced at the suppression hearing, the court, in order to make ultimate credibility determinations, has carefully weighed the conflicting factual accounts of defendant's arrest. After due consideration of all the credible evidence in the record, including the testimony and demeanor of the witnesses and the exhibits admitted into evidence, the court finds that "the government's presentation of the facts and the testimony of its witnesses are more credible than the version recited by the defendant." *United States v. Marrero*, No. 90 Cr. 823 (LBS), 1991 U.S. Dist. LEXIS 3619, at *9 (S.D.N.Y. Mar. 26, 1991) (citation omitted)).

Unlike *Marrero* and another case cited by the defendant, *Irving*, 2009 U.S. Dist. LEXIS 110178, where there were direct material contradictions among the police officers' testimony, the testimony by Sergeant Cotton and Officers Perrotta, Finnegan, and Nathaniel was plausible, consistent, and

credible.[19]  Contrary to defendant's contention, the fact that

there was another person – Mr. Soler - arrested at approximately

the same time as defendant in front of the same multi-family

dwelling neither undermines the credible testimony of Officers

Perrotta and Finnegan nor renders the defendant's arrest and the

seizure of the handgun violative of the Fourth Amendment.  While

there is some uncertainty regarding when and where Mr. Soler was

arrested in relation to the defendant, given the fact that

Officers Perrotta and Finnegan do not recall another arrest

taking place in front of 578 Williams Avenue on the day in

---

[19]  The defendant argues that Officer Perrotta's testimony
"strains credulity" because "[i]t simply makes no sense that a person –
especially a parolee who has absconded and is on the lam – would be standing
in the doorway holding a gun in open view at four o'clock in the afternoon."
(Def. Mem. at 7.)  As the government points out and this court previously
recognized, however, Officers Perrotta and Finnegan were in street clothes
(Sept. 23, 2011 Tr. at 5-6; Tr. at 199) and the defendant might not have been
able to identify them as police officers prior to concealing his weapon.
(See Sept. 23, 2011 Tr. at 51; Gov't Opp'n at 26-27.)  Moreover, defendant's
own admissions that he had a firearm and the reasons he possessed it are
consistent with the accounts of Officers Perrotta and Finnegan.

In addition, the defendant seeks to convince this court to
disregard the police officers' testimony as false or unreliable on the basis
of a New York Times article describing police abuses with respect to
unjustified searches, the 1994 Mollen Commission report regarding police
perjury in suppression hearings, and civil cases brought against Sergeant
Cotton and Officers Nathaniel and Diaz.  (See Def. Reply at 8-11.)  Sergeant
Cotton and Officers Nathaniel and Diaz, however, were not directly involved
in defendant's arrest.  Nevertheless, the court finds no basis on the record
before it to question the credibility of the police officers in this case.

question[20], this is not a not a dispositive inconsistency and the officers' lack of recollection can be attributed to the passage of time and the large number of similar arrests made by the officers.  *See Marrero*, 1991 U.S. Dist. LEXIS 3619, at *10.

The officers' credible testimony stands in stark contrast to that of the defendant's declaration and his civilian witnesses – at least two of which testified to circumstances indicating anti-police bias.  The defendant's efforts to support his motion to suppress with a likely fabricated declaration and civilian witnesses who are likely testifying to a story concocted by defendant in accordance with his instructions are unavailing.  Indeed, defendant's well-documented attempts to obstruct justice and tamper with witnesses render his declaration and his witnesses incredible.  The defendant also admitted on two separate occasions that he did in fact have a gun in his possession on the day of his arrest, which directly contradicts his declaration and the testimony of Mr. Soler.

Moreover, there is a direct contradiction between the testimony of Ms. Torres and Mr. Soler regarding a material fact at issue — how the police entered defendant's apartment.  Ms.

---

[20]  The government concedes that it is not known where Mr. Soler was at the time the officers arrested the defendant in the building entryway, but suggests that "[t]he logical inference (since Officer Perrotta did not see Soler outside the building when he arrested the defendant or inside the apartment when he went to get the defendant's clothing) is that Soler arrived at the front of 578 Williams Avenue at approximately the same time that Lt. Cotton, Officer Nathaniel and Officer Diaz drove up."  (Gov't Opp'n at 25 n.14.)

Torres claimed that the police officers used a battering ram to break into the defendant's apartment (Tr. at 68-70), while Mr. Soler contended that the officers kicked the door down and said that he did not see a battering ram (*id.* at 97, 117-18, 120). Given this inconsistency, it is no surprise that the defendant's and Mr. Soler's efforts to develop pictures of the allegedly broken door were not fruitful.[21]  In addition, Mr. Soler testified that he and the defendant were in separate rooms when the police entered the apartment (*id.* at 91, 95, 115-18, 146-47), but the defendant claimed that two of them were "hanging out and talking" when the police entered (Declaration ¶ 2). This is a material inconsistency between Mr. Soler's testimony and the defendant's declaration.

Finally, the court finds that the defendant's account of events is implausible given the credible and consistent testimony by Sergeant Cotton and Officer Finnegan that the SNEU team is simply not trained to perform forced entries into an apartment and that they do not kick down doors or perform such entries.  (*Id.* at 24-27, 208-11.)  Indeed, such forced entries are conducted by a designated Emergency Service Unit consisting

---

[21]  For unexplained reasons, Mr. Soler waited more than a year until two weeks prior to the November 21-22, 2011 suppression hearing to develop the photos he took of the allegedly "broken" door, and only then he developed the photos at the request of Special Agent Hernandez.  (Tr. at 89, 100-04.)  The photos ended up being overexposed and did not come out.  (*Id.* at 104; *see* Def. Ex. F.)

of six to eight officers with protective helmets, special bullet proof vests, rifles, and riot shields.  (*Id.*)

Accordingly, the court finds by a preponderance of the evidence that on November 24, 2010, Officer Perrotta, who was walking south with Officer Finnegan on Williams Avenue towards Newport Street, a drug prone area, observed the defendant in the entryway of 578 Williams Avenue holding a firearm in his right hand in plain view of the street.  Officer Perrotta and his partner therefore had reason to believe that a criminal offense had been or was being committed, namely criminal possession of a weapon[22], and had probable cause to arrest the defendant and seize the handgun that was in plain view.  *See United States v. Morrell*, 138 Fed. Appx. 373, 374 (2d Cir. 2005) (finding probable cause to arrest defendant for being a felon in possession of firearms "[b]ecause the state troopers knew that appellant had prior felony convictions and had been recently seen riding in a truck in which firearms were in plain view"); *United States v. Sheffield*, No. 96-1279 1996 U.S. App. LEXIS 28307, at *5-6 (2d Cir. Oct. 31, 1996) ("Once the gun handle became visible, there was probable cause for a full arrest and

---

[22] New York Penal Law 265.01(1) states that "[a] person is guilty of criminal possession of a weapon in the fourth degree when: (1) he or she possesses any firearm."  N.Y. Penal Law § 265.01(1).  A person is guilty of criminal possession of a weapon in the third degree when "[he] commits the crime of criminal possession of a weapon in the fourth degree" as defined in N.Y. Penal Law § 265.01(1)-(3),(5), "and has been previously convicted of any crime."  N.Y. Penal Law § 265.02(1); *see People v. Montilla,* 862 N.Y.S.2d 11 (2008).

the plain view exception to the Fourth Amendment was satisfied." (citation omitted)); *United States v. Guadalupe*, 363 F. Supp. 2d 79, 83 (D. Conn. 2004) ("[T]he gun protruding from Defendant's pants was plainly visible to the Officers and thus seizing the gun is supported by the plain view doctrine. Although warrantless searches are presumptively unreasonable, where an object is in plain view, neither its observation nor its seizure involves an invasion of privacy." (citing *Arizona v. Hicks*, 480 U.S. 321, 325 (1987))); *see also United States v. Scopo*, 19 F.3d 777, 782 (2d Cir. 1994) (finding that police were justified in seizing a firearm in plain view and stating that "the mere presence of a partially concealed firearm is highly and immediately incriminating").

## CONCLUSION

For the foregoing reasons, the government has met its burden to establish by a preponderance of the evidence that Officers Perrotta and Finnegan had probable cause to arrest the defendant and seize the handgun in plain view, and the motion to suppress is denied in its entirety.

The parties shall advise the court in writing via ECF by 5:00 PM on January 25, 2012 as to how they intend to proceed

with this case, including whether they intend to proceed to trial on January 30, 2012.

SO ORDERED.

Dated:  Brooklyn, New York
        January 23, 2012

                                        _____/s/_____
                                        KIYO A. MATSUMOTO
                                        United States District Judge
                                        Eastern District of New York